**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ERIC SCHORLING,

        Petitioner,                         Case Number: 2:08-cv-13261

v.                                                   HONORABLE NANCY G. EDMUNDS

MILLICENT WARREN,

        Respondent.
_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF
HABEAS CORPUS BUT GRANTING A CERTIFICATE OF APPEALABILITY**

Petitioner Eric Schorling, through counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner, a state inmate who is currently incarcerated at Pugsley Correctional Facility in Kingsley, Michigan, challenges his conviction for assault with intent to murder. Respondent has filed an Answer in Opposition to the Petition for Writ of Habeas Corpus. For the reasons set forth below, the Court denies the petition.

**I. Facts**

Petitioner's conviction arose from a stabbing that occurred on September 27, 2004 at Romeo High School in Romeo, Michigan. Nichol Lambert suffered non-fatal injuries during the incident.

Lindsay Gibson testified at trial that, on Saturday, September 25, 2004, she was present at Croswell Elementary School when she heard Lambert shout at Petitioner, "I hate

you, you Nazi!" Tr., Vol. II., p. 79.[1] Petitioner screamed in return, "I'm going to kill you. You're . . . dead." Tr., Vol. II, p. 80. Petitioner then said to Gibson, "Just wait. I'm going to kill [Lambert]." Tr., Vol. II., p. 81.

Stacey Palmer testified that, on Sunday, September 26, 2004, Petitioner informed her that he was "giving all his stuff away" because "he was going to jail for a long time." Tr., Vol. II., p. 85, 87. On the following morning (Monday, September 27, 2004), Palmer saw Petitioner at Romeo High School. Because Petitioner was no longer enrolled at the school, Palmer asked Petitioner what he was doing there. Petitioner then told Palmer that "[he] woke up th[at] morning and . . . knew [he] had to do it. [He] knew [he] had to kill [Lambert]." Tr., Vol. II, p. 87. Petitioner showed Palmer "an eight-inch kitchen knife" concealed in his right sleeve. Tr., Vol. II., p. 87-88. Lambert then came around the corner. Petitioner ran after Lambert and asked Palmer whether she "want[ed] to watch." Tr., Vol. II., p. 89.

Later that same morning, James Geister observed Petitioner "coming down the hallway very rapidly." Petitioner told Geister, "Dude, I just . . . stabbed [Lambert], I just . . . stabbed her." Tr., Vol. II., p. 112. Petitioner then said to Geister, "Well, . . . I got to go. I got to get out of here." Tr., Vol. II., p. 113.

Meanwhile, Lambert walked into the classroom of high school teacher David Robertson and stated that she felt like she had been punched. Tr., Vol. II., p. 63. Robertson observed Lambert collapse to her knees and fall forward in front of him. A large knife was sticking out of Lambert's back. Tr., Vol. II., p. 64.

Dr. Friedrich Dutka examined Lambert later that day and observed a knife stuck in

---

[1] "Tr." refers to the transcript of trial, which consists of four volumes.

her left flank. Tr., Vol. III., p. 9. Dutka testified that Lambert was stabbed one time with "quite [a bit] of force" and that she sustained injuries to her stomach, spleen, and diaphragm. Tr., Vol. III., p. 11-13, 20. Dutka and his surgical team removed the knife from Lambert's back. Lambert was near death at the time, and she would have died if she had not been treated. Tr., Vol. III, p. 11.

Sergeant Lawrence Duda testified that, on the morning of September 27, 2004, he received a description of a suspect who stabbed a female student at Romeo High School and fled the scene. Duda found Petitioner, who matched the suspect's description, at the Romeo Water Treatment Plant near Romeo High School. Tr., Vol. II., p. 40-41. Duda and another Macomb County deputy sheriff arrested Petitioner.

Christopher Laurain testified that, while he and Petitioner were confined at the Macomb County Jail on October 2, 2004, Petitioner told Laurain that he would spend many years wishing he had pulled the knife out of Lambert's back. Tr., Vol. II., p. 119. Petitioner also told Laurain that his initial plan had been to approach Lambert from behind, grab her hair, and slit her throat. He hoped that she had a big scar. Tr., Vol. II, p. 120.

Lambert testified that she and Petitioner dated each other from October 2003 to June of 2004. Both of them were bitter after they broke up with each other. She was in the eleventh grade in September of 2004 when the stabbing occurred. She thought at the time that she had been punched, not stabbed. Tr., Vol. II, p. 172-74, 182.

Lambert admitted on cross-examination by defense counsel that she had teased Petitioner and called him a Nazi because he had a Swastika tattoo on his stomach. She knew he was sensitive about the tattoo, but continued to tease him about it. Tr., Vol. II, pp. 177-78, 182-84, 186.

3

Petitioner did not testify. The only defense witness was the officer in charge of the case, Detective Sergeant Rick Seldon, who testified about his investigation of the case. Seldon admitted during his testimony that Stacey Palmer did not mention an intent to kill when she gave a written statement to the police. In fact, Palmer first mentioned an intent to kill at the preliminary examination after Seldon and the prosecutor talked with her. Tr., Vol. III, pp. 45-46. Seldon also admitted that, according to records maintained by the Macomb County Jail, Christopher Laurain was suicidal at the time of his arrest. Tr., Vol. III, p. 50.

The sole issue at trial was Petitioner's intent at the time of the stabbing. His defense was that he did not intend to kill Lambert and that he was merely guilty of assault with intent to do great bodily harm less than murder.

## II. Procedural History

Petitioner was charged in Macomb County with (1) assault with intent to commit murder, (2) assault with a dangerous weapon, (3) carrying a dangerous weapon with unlawful intent, and (4) carrying a concealed weapon. Before trial, the prosecutor dismissed the second count (assault with a dangerous weapon), and, during trial, Petitioner pleaded guilty to carrying a dangerous weapon with unlawful intent and carrying a concealed weapon. The case went to the jury on the first charge, and on October 28, 2005, the jury found Petitioner guilty of assault with intent to commit murder, Mich. Comp. Laws § 750.83. On December 16, 2006, Petitioner was sentenced to ten to fifteen years for assault with intent to commit murder, one to five years for carrying a dangerous weapon with unlawful intent, and one to five years for carrying a concealed weapon. The sentences were ordered to be served concurrently.

Petitioner filed an appeal as of right in the Michigan Court of Appeals, presenting the following claims:

> I. A criminal defendant has the fundamental right to present a defense under the Fourteenth Amendment due process clause. The trial court refused to allow S[c]horling's defense to the assault with intent to murder charge, which would have been that he lacked the physical ability to form the specific intent charged. Thus the court violated S[c]horling's right to present a defense since he could not challenge the prosecution's proof that he intended to murder Lambert.
>
> II. A criminal defendant has the fundamental right to present a defense under the Fourteenth Amendment due process clause. The trial court refused to allow S[c]horling's defense to present evidence that he was the victim of teenage bullying and acted out of this victimization when he assaulted Lambert. Thus, the court violated S[c]horling's right to present a defense since he could not challenge the prosecution's proof that he intended to murder Lambert.

The Michigan Court of Appeals affirmed Petitioner's assault conviction in an unpublished, *per curiam* opinion. *See People v. Schorling*, No. 268026 (¶ 1) (Mich. Ct. App. July 19, 2007). Petitioner sought leave to appeal in the Michigan Supreme Court, which was not persuaded to review the issues. *See People v. Schorling*, 741 N.W.2d 380 (Mich. 2007) (table).

Petitioner filed the pending petition for a writ of habeas corpus on July 29, 2008, presenting the following claim:

> A criminal defendant has the fundamental right to present a defense under the Fourteenth Amendment due process clause. Schorling sought to present two defenses to the specific intent element. One, he lacked the physical ability to form the specific intent required. Two, he acted because he was the victim of teenage bullying. By denying him the ability to present defenses to the prosecution's proof that he intended to murder Lambert when he assaulted her, the Michigan courts violated his due process rights.

Respondent argues that the trial court's exclusion of expert testimony did not deprive

5

Petitioner of his due process right to present a defense. Respondent maintains that the state appellate court's adjudication of Petitioner's claim did not result in an unreasonable determination of the facts and was not contrary to, or an unreasonable application of, Supreme Court precedent.

### III. Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review on federal courts reviewing applications for a writ of habeas corpus:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Additionally, this Court must presume the correctness of state-court factual determinations. 28 U.S.C. § 2254(e)(1);[2] *see also Cremeans v. Chapleau*, 62

---

[2] 28 U.S.C. § 2254(e)(1) provides, in pertinent part:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state-court findings unless they are clearly erroneous").

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases . . . .
>
> A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable . . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409-11 (emphasis in original).

### IV.  Petitioner's Claim

7

Petitioner argues that he was denied his right to present the defense that he lacked the physical ability to form the specific intent to murder and that he was the victim of teenage bullying. This issue first arose when the prosecutor moved to preclude defense counsel from presenting two expert witnesses on the issue of Petitioner's ability to form an intent to commit murder. Petitioner wanted to produce Michael A. Abramski, a psychologist, to testify that teenagers do not have well-developed frontal brain lobes and therefore do not appreciate the consequences of their actions. The other proposed defense expert was Glen Stutsky, who would have testified that teenage bullying is similar to battered-spouse syndrome in that the victim believes nothing is going to change and that he or she has to do something violent to stop the abuse.

The trial court denied defense counsel's request to present the two expert witnesses on the ground that the defenses were not recognized under state law. Tr., Vol. I, pp. 9-19. Defense counsel later renewed his request to present the witnesses, but the trial court refused to change its ruling. The court stated that the defenses were similar to a diminished-capacity defense, which was no longer a recognized defense in Michigan. Tr., Vol. IV, pp. 9-12.

The Michigan Court of Appeals affirmed the trial court's ruling. It rejected Petitioner's characterization of his frontal-lobe condition as physical and held that the trial court properly refused to admit expert-witness testimony that Petitioner did not have fully developed frontal brain lobes. The Michigan Court of Appeals held that evidence of teenage bullying was inadmissible for the same reason that evidence of underdeveloped frontal lobes was inadmissible: the lack of capacity to form intent or the inability to control one's actions does not avoid or reduce criminal responsibility by negating specific intent

unless the person was suffering from legal insanity, as defined in the statute.

## A. The State Law Issue

In Michigan, the insanity defense is "an all or nothing" defense; "evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent." *People v. Carpenter*, 627 N.W.2d 276, 283 (Mich. 2001). To the extent that Petitioner is challenging the application of *Carpenter* to his case or the state court's interpretation of Michigan's insanity statute, Mich. Comp. Laws § 768.21a,[3] he has no right to habeas relief. The Constitution does not require states to recognize the defense of diminished capacity, *Wong v. Money*, 142 F.3d 313, 324 (6th Cir. 1998), and the writ of habeas corpus may not be granted upon a perceived state-law error, *Gilmore v. Taylor*, 508 U.S. 333, 344 (1993). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S.

---

[3] This statute reads in relevant part:

It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness as defined in section 400a of the mental health code, Act No. 258 of the Public Acts of 1974, being section 330.1400a of the Michigan Compiled Laws, or as a result of being mentally retarded as defined in section 500(h) of the mental health code, Act No. 258 of the Public Acts of 1974, being section 330.1500 of the Michigan Compiled Laws, that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. Mental illness or being mentally retarded does not otherwise constitute a defense of legal insanity.

Mich. Comp. Laws § 768.21a(1).

9

62, 67-68 (1991), and *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)). Thus, this Court defers to the judgment of the Michigan Court of Appeals that evidence of mental incapacity short of insanity was not admissible.

### B. The Right to Present a Defense

The remaining question is whether excluding expert testimony on teenage bullying and underdeveloped frontal lobes violated Petitioner's constitutional right to present a defense. The United States Supreme Court "has repeatedly recognized that the right to present a complete defense in a criminal proceeding is one of the foundational principles of our adversarial truth-finding process." *Gagne v. Booker*, __ F.3d __, __, No. 07-1970, 2010 U.S. App. Lexis 10582, at *13 (6th Cir. May 25, 2010). A defendant's right to due process in a criminal trial is, "in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). In other words, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1988). The exclusion of evidence in a criminal trial "abridge[s] an accused's right to present a defense" only where the exclusion is " 'arbitrary' or 'disproportionate to the purpose[ ] [it is] designed to serve.'" *Id.* (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). In applying the *Rock* standard or some earlier formulation thereof, the Supreme Court has "found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308 (citing *Rock*, 483 U.S. at 58, *Chambers*, 410 U.S. at 302, and

*Washington v. Texas*, 388 U.S. 14, 22-23 (1967)).

## C. Application

In *Fisher v. United States*, 328 U.S. 463 (1946), the Supreme Court considered the case of a man who was charged in the District of Columbia with premeditated murder. The defense theory was that, although the defendant was sane at the time of the killing, his mental and emotional qualities were such that he was incapable of deliberation and premeditation. He sought a jury instruction charging the jury to consider evidence of his psychopathic aggressive tendencies, low emotional response, and borderline mental deficiency when determining whether he was guilty of premeditated murder. The trial court declined to give the requested jury instruction, and the Supreme Court upheld the trial court's decision. The Supreme Court acknowledged that "there are more possible classifications of mentality than the sane and the insane." *Id*. at 475. However, the Supreme Court stated that, for it to force the District of Columbia to adopt Petitioner's rule of responsibility "would involve a fundamental change in the common law theory of responsibility." *Id*. at 476.

More recently, the United States Court of Appeals for the Sixth Circuit considered the case of an Ohio woman who did not present an insanity defense at trial, but sought to produce two psychologists as witnesses to establish the defense of diminished capacity. *See Wong v. Money*, 142 F.3d at 313. The trial court denied the petitioner's request on the ground that Ohio law did not permit psychiatric testimony unrelated to the insanity defense to show that, due to mental illness, or some other reason, the defendant lacked the mental capacity to form the *mens rea* element of the crime charged. The Court of Appeals for the Sixth Circuit determined that the petitioner's right to present a defense was not violated by

11

the exclusion of the psychiatric testimony because (1) the evidence was inadmissible under Ohio law, (2) the petitioner was not precluded from testifying in her own defense, and (3) she was not precluded from introducing factual evidence about the alleged crime.

Petitioner likewise was not precluded from testifying in his own defense. He also was not precluded from presenting lay testimony that he did not have the requisite intent to commit murder. Furthermore, his trial attorney was permitted to argue to the jury that teenagers are children and should not be held to the same standard as adults, that a sixteen-year-old individual like Petitioner has very limited experience, and that children are impulsive and do not think about the consequences of their actions. Tr., Vol. IV, pp. 45 and 55. Defense counsel also was permitted to argue to the jury that Petitioner merely wanted the name-calling to stop and that he lacked the intent to kill. Tr., Vol. IV, pp. 45-46, 50.

The Court concludes that Petitioner's constitutional right to present a defense was not violated by the exclusion of expert witness testimony regarding teenage bullying and Petitioner's allegedly underdeveloped frontal lobes. The excluded evidence was meant to negate the specific intent to commit murder. Because such evidence is not admissible under state law without a showing of insanity and because the evidence could have confused the issues or misled the jury, the trial court's ruling was not arbitrary or disproportionate to the purpose it was designed to serve. The state court's ruling also did not infringe on a weighty interest of the accused because Petitioner had other means of presenting his defense.

Petitioner contends that the Supreme Court's decision in *Fisher* has been undermined by subsequent due process decisions. However, in *Clark v. Arizona*, 548 U.S. 735 (2006), the Supreme Court noted that states are "free to define the insanity defense"

and may preclude a diminished-capacity defense. *Id.* at 772 & 773 n.42. The Supreme Court also acknowledged that "a State that wishes to avoid a second avenue for exploring capacity, less stringent for a defendant, has a good reason for confining the consideration of evidence of mental disease and incapacity to the insanity defense." *Id.* at 772. The Court found no violation of due process in a state's decision "to channel . . . expert testimony to consideration on the insanity defense . . . ." *Id.* at 778. *Clark* leaves little doubt of the continued viability of the Supreme Court's decision in *Fisher*.

In a final effort to buttress his claim, Petitioner argues that teenage bullying should receive similar treatment to battered-spouse syndrome. Battered-spouse syndrome, however, "augments a claim of self defense." *Francis v. Miller*, No. 07-0140-CV-W-ODS, 2007 U.S. Dist. Lexis 85525, at *13 (W.D. Mo. Nov. 19, 2007) (unpublished), *aff'd*, 557 F.3d 894 (8th Cir. 2009); *see also Walker v. Kernan*, No. C-95-0101 SI, 1997 U.S. Dist. Lexis 3857, at *19 (N.D. Cal. Mar. 27, 1997) (unpublished opinion explaining that evidence of battered-spouse syndrome is used to support a self-defense claim that the spouse had no other choice but to kill his or her spouse to escape violence), *aff'd*, 156 F.3d 1241 (9th Cir. 1998) (table).

Petitioner's defense theory was not self defense, but that he did not intend to kill Lambert. Thus, there was no basis for treating teenage bullying like battered-spouse syndrome.

### V. Conclusion

The decision of the Michigan Court of Appeals was not contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, **IT IS ORDERED** that

the petition for a writ of habeas corpus is **DENIED** and this matter is **DISMISSED WITH PREJUDICE**.

In the event Petitioner files a timely notice of appeal and a request for a certificate of appealability pursuant to 28 U.S.C. § 2253 and Fed. R. App. P. 22(b), Section 2253 requires a habeas petitioner to seek a certificate of appealability from this court.

The court may issue a certificate of appealability if the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A petitioner need not "sho[w] that the appeal will succeed." *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

This Court finds that, with respect to Petitioner's constitutional claim, Petitioner has made a substantial showing of the denial of a constitutional right–that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further. *See, e.g.,* Justice Marilyn J. Kelly's dissent in *Carpenter*, 627 N.W.2d at 285-92 (finding that the majority's decision to bar defendants from introducing psychiatric evidence of mental abnormality to negate the *mens rea* of the crime charged violates the defendant's right to due process).

Being further advised in the premises and having reviewed the record and the pleadings, the Court hereby **GRANTS** any request for a certificate of appealability on Petitioner's constitutional claim.

SO ORDERED.

        s/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated: June 24, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 24, 2010, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager